# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **SHARRON LAMB** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION 6:16cv1124** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 25, 2016, Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying her application for Social Security benefits. The matter was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636. For the reasons below, the Commissioner's final decision is **AFFIRMED** and this social security action is **DISMISSED WITH PREJUDICE**.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits and an application for supplemental security income on February 5, 2013, alleging disability beginning on August 9, 2010. The applications were denied initially on May 6, 2013, and again upon reconsideration on October 14, 2013. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a hearing and entered an unfavorable decision on March 21, 2015. Plaintiff sought review from the Appeals Council. On June 24, 2016, the Appeals Council denied the request for review. As a result, the ALJ's decision became that of the Commissioner. Plaintiff then filed this lawsuit on August 25, 2016, seeking judicial review of the Commissioner's decision.

**STANDARD**

Title II of the Act provides for federal disability insurance benefits. Title XVI of the Act provides for supplemental security income for the disabled. The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1983); *Rivers v. Schweiker*, 684 F.2d 1144, 1146, n. 2 (5th Cir. 1982); *Strickland v. Harris*, 615 F.2d 1103, 1105 (5th Cir. 1980).

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (*per curiam*). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a

claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment"

is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id*.; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id*. To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot

perform his past relevant work.  *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (*per curiam*).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis).  First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work.  20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1).  Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation.  20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4).  Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment.  20 CFR §§ 404.1520a(d), 416.920a(d).  If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1).  Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing.  20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2).  Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]."  20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

# ALJ'S FINDINGS

The ALJ made the following findings in his March 21, 2015 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since August 9, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: congenital hydrocephalus post-shunt, headaches, scoliosis status post-surgery, lumbago, obesity, carpal tunnel syndrome, history of vertigo, affective disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that the claimant can lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and walk at least 2 hours of an 8 hour workday and sit for 6 hours of an 8 hour workday. She can frequently climb ramps and stairs, but never climb ladders, ropes, and scaffolds; may occasionally balance and stoop; and should avoid even moderate exposure to hazards such as dangerous moving machinery and unprotected heights, and vibration. Furthermore, the claimant is limited to simple, routine, repetitive tasks with no more than occasional contact with the general public, co-workers and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965.

7. The claimant was born on June 16, 1972 and was 38 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 9, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## ADMINISTRATIVE RECORD

*Medical Record*

The medical record reveals that Plaintiff had removal of an old ventriculoperitoneal shunt on September 8, 2009 with creation of a new right frontal VP shunt. The record states that Plaintiff first had shunt placement at eight weeks of age due to idiopathic hydrocephalus and multiple shunt revisions over the years. Dr. Grahm adjusted the shunt at follow up appointments over the next eight months. On October 14, 2009, Dr. Grahm noted that Plaintiff was doing really well. A CT of the brain without contrast on the same date showed right frontal ventriculoperitoneal paired shunts in stable position and the left lateral ventricle remained prominent in the body and anterior horn, which was described as a stable and chronic finding. A repeat CT on November 18, 2009 showed no acute findings.

Plaintiff went to the emergency room complaining of a headache on December 3, 2009. A head CT showed a stable examination compared to the study on September 9, 2009. The CT showed stable ventriculomegaly, right frontal ventriculostomy in stable position and an older ventricular shunt tube in place. No extra-axial hematoma or fluid collection was seen. Plaintiff returned to the emergency room on February 26, 2010 with strep pharyngitis and then on May 3, 2010 with a headache and vomiting. A head CT showed the ventricular system slightly smaller than the previous CT and the ventriculoperitoneal shunt catheters remained in a functional position. There was no distinct new intracranial pathology seen. A radiographic shuntogram under

fluoroscopy on May 13, 2010 showed an intact ventriculoperitoneal shunt catheter from the ventricle to the abdominal cavity.

Plaintiff returned to the emergency room on July 16, 2010 stating that she passed out and had a headache. Chest X-Rays showed no acute chest disease and a lumbar X-Ray showed no acute fracture or malalignment. Plaintiff's head CT showed no new disease or significant interval since her CT on May 4, 2010 and the ventriculoperitoneal shunt catheters were stable in position.

Prior to her alleged onset date, Plaintiff saw Dr. Wies for her primary care. Dr. Wies treated Plaintiff for lumbago, allergic rhinitis and headaches due to hydrocephalus. On December 7, 2009, a few months after Plaintiff's shunt surgery, Plaintiff reported continued frontal headache. On examination, Plaintiff had normal range of motion for her age, no bone or joint symptoms or weakness, no abnormalities of the back or spine, and normal musculature. Plaintiff was alert and oriented and did not have any unusual anxiety or evidence of depression. On January 7, 2010, Plaintiff reported that she was doing better with the headaches and that trazadone helped. Dr. Wies's examination on this date and on July 26, 2010 were the same as the December 7, 2009 examination. On August 30, 2010, Plaintiff complained of back pain. Dr. Wies noted that the rods from scoliosis treatment were in place and instructed Plaintiff to take over-the-counter medication.

S.C. Westmoreland, Ed.D., performed a consultative psychological examination on April 30, 2012. Dr. Westmoreland's notes state that Plaintiff walked unassisted and was mildly restless. Her speech was clearly articulated and she showed the capacity for abstract reasoning, but mild paranoia and obsessive thinking were inferred. Plaintiff denied any suicidal actions or ideation, but stated that she has temptations to cut herself and she has self-deprecating thoughts. Dr. Westmoreland described Plaintiff's mood as depressed and anxious, despite a somewhat elated

affect.  Plaintiff's recent and immediate memory was normal.  The only deficiency in Plaintiff's remote memory was during the time period of her parents' divorce.  Plaintiff exhibited sufficient concentration to recite serial sevens, counting down, and to compute a simple math problem.  She was also able to slowly count serially by threes in reverse.  Dr. Westmoreland opined that Plaintiff's judgment was average based on her report.

Plaintiff reported a history of extreme anxiety from a young age.  She stated that she takes Tylenol for migraine headaches and Benadryl for allergies.  Dr. Westmoreland noted that Plaintiff had a nervous tic in her mouth that quivered.  Plaintiff reported that she takes care of her cat, does part of the laundry folding, washes dishes and does limited cooking.  She does not socialize outside of the home or attend church.  She stated that she worked at Fed Ex for ten years and had to quit because her shunt was being inadvertently recalibrated by machines at her work site.  Plaintiff's extenuating life circumstances include being left by her mother and raped by her brother.

Dr. Westmoreland opined that Plaintiff's chronic anxiety and depression may be explained by the considerable time Plaintiff spent alone during her childhood while having surgeries for hydrocephalus.  Plaintiff stated that she has difficulty with crowds or groups of people.  Additionally, Plaintiff's mother left her and moved away during the same time period Plaintiff had major surgery for scoliosis.  Plaintiff has not married or had any boyfriends and reported confrontational encounters with co-workers, as well as chronic migraine headaches.  Plaintiff reported frequent crying and irritability.  Plaintiff described feeling explosive after bottling up her feelings, fighting off the temptation to cut herself and giving herself a black eye on one occasion when she was mad at herself.  Dr. Westmoreland diagnosed child abuse, sexual, and generalized anxiety disorder.  He assessed a GAF score of 55.

Dr. Peter Sanfelippo conducted a consultative physical examination on May 3, 2012. Dr. Sanfelippo reviewed Plaintiff's records and examined her. Plaintiff reported decreased visual acuity, obesity, arthritis, back pain, and dizziness. She had a blood pressure of 150/90 and a BMI of 41. Plaintiff was alert and oriented and groomed. She exhibited moderate scoliosis but she had an upright posture with a normal gait. Muscle strength was normal throughout and Plaintiff was able to tandem walk and toe to heel walk without difficulty. She was able to squat but she was not able to hop. Plaintiff had normal grasp with both hands and full range of motion in all fingers, both wrists, both hands, both arms and both shoulders. She also had full range of motion in both ankles, both knees and both hips. Deep tendon reflexes were normal and bilaterally equal. Plaintiff's lumbar spine range of motion was normal. She had moderate thoracic spine dextroscoliosis, confirmed on X-Ray, but no localized vertebral tenderness or paravertebral muscle spasm. Lumbar X-Ray showed Harrington rods extending from T4 to L2.

Dr. Sanfelippo assessed morbid obesity, scoliosis post surgical correction, congenital hydrocephalus with functioning ventriculoperitoneal shunt, history of headaches and history of vertigo. He opined that Plaintiff is able to perform work activities that involve sitting, standing, moving about, and lifting, carrying and handling objects, and she is able to hear and speak. Dr. Sanfelippo noted that there is no evidence of end organ damage and her reported pain level exceeds his findings on physical examination. Despite Plaintiff's reported back pain, she has no cord or radicular symptoms, she has an upright posture and normal gait, and she had a normal active range of motion in the lumbar spine. There is no atrophy in the upper or lower extremities. Plaintiff exhibited normal strength, coordination, dexterity and range of motion in her fingers and hands. She also had normal grip strength and a full ability to reach, handle, finger, and feel with both hands. Plaintiff exhibited no problems participating in conversation or completing sentences.

Plaintiff had another consultative psychological examination on April 5, 2013 by Wilson Renfroe, Psy.D. Plaintiff was dressed within normal limits and she was appropriately groomed. She was cooperative and exhibited no problems with her posture or gait and did not have any involuntary movements. Plaintiff reported chronic anxiety since childhood, difficulty in crowds and feeling that everything has to be in order. Plaintiff stated that she had to stop working at Fed Ex after ten years because her anxiety became very problematic. She described taking care of her own personal needs and helping around the house. She stated that her father gives her transportation and handles the finances. Socially, she stated that she is isolated and only goes shopping with her father. She expressed some difficulty in completing tasks.

Plaintiff freely engaged in conversation and her behavior was within normal limits. She exhibited intact speech and thought processes. Plaintiff reported some suicidal ideation, but no current plan or intent. Plaintiff described her mood as quite depressed and stated that she struggles with anxiety. She has never taken any psychiatric medication. There was no evidence of delusions or hallucinations. Plaintiff reported flashback memories and exhibited avoidance behavior around people or places that remind her of her abusive situations. Plaintiff described intermittent insomnia and she exhibited a flat affect. Dr. Renfroe observed average intelligence with an adequate fund of general information and Plaintiff was oriented to person, place and time. Plaintiff showed intact recent and remote memory and somewhat intact immediate memory. Judgment and insight were mostly intact. Dr. Renfroe diagnosed generalized anxiety disorder and major depression. He strongly suspected post traumatic stress disorder and obsessive/compulsive disorder. Dr. Renfroe assessed a GAF score of 45 due to significant deficits related to mental health difficulties with anxiety and ability to function effectively in relationships. He considered her prognosis to be poor. Dr. Renfroe opined that Plaintiff has the ability to understand directions, but may have difficulty

carrying them out due to her mental health difficulties. He stated that concentration will be difficult for her in a social setting, as well as any social relationships due to her mental health problems. Further, he determined that pressure situations would also be quite difficult for her.

Dr. Sanfelippo conducted a second physical consultative examination on April 15, 2013. At this examination, Plaintiff had a blood pressure of 148/88 and a BMI of 43. She was alert and oriented and well groomed. Plaintiff's upper and lower extremities had normal range of motion and she had normal grasp and squeeze with both hands. Plaintiff's lumbar spine had normal range of motion without difficulty and she did not have localized vertebral tenderness or paravertebral muscle spasm. Muscle testing was normal and Plaintiff was able to tandem walk and toe to heel walk without difficulty. She was able to squat, but she could not hop. Plaintiff walked with a normal gait and straight leg raises were negative.

Dr. Sanfelippo assessed morbid obesity, congenital hydrocephalus, corrected with functional shunt, status post surgically corrected scoliosis, and history of headaches. He concluded that Plaintiff is able to perform work activities that involve sitting, standing, moving about, and lifting, carrying and handling objects, and she is able to hear and speak. There is no evidence of any end organ damage. Plaintiff does not have any cord or radicular symptoms. She had an upright posture with a normal gait and a normal active range of motion in the lumbar spine. There was no evidence of persistent disorganization of motor function in the upper or lower extremities.

Plaintiff was seen by Dr. Jathan Cantu at Total Healthcare Center on May 29, 2013. Plaintiff's primary complaint was migraine headaches. Plaintiff reported having migraine headaches twice per month and taking Tylenol for her pain. Plaintiff had a blood pressure of 164/91. Dr. Cantu noted that Plaintiff's mood was dysthymic but her affect and appearance were normal and she did not exhibit any impairment in thought content. Plaintiff had normal speech,

motor strength and gait.  Dr. Cantu advised Plaintiff to start a trial of Celexa for depression, Nortriptyline for sleep and Imitrex for migraines.

Plaintiff saw Stephanie Reed, FNP-C, four times between November 15, 2013 and July 31, 2014.  Nurse Reed noted a blood pressure of 151/101 on November 15, 2013 and stated that Plaintiff does not have a history of hypertension but her blood pressure is elevated with headache pain.  Plaintiff reported diarrhea with blood, back pain, numbness and sleep disturbance.  Plaintiff was prescribed Antivert for dizziness, Celexa for depression, Imitrex for migraine, and Bactrim DS.  On December 18, 2013, Plaintiff reported having three to four migraines over the previous month, dizziness and congestion.  Nurse Reed noted that hypertension was a new problem, uncontrolled, with associated symptoms including headaches.  Plaintiff had slight edema to the right hand and a slight decrease in range of motion as compared to the left.  Plaintiff had a normal mood and affect.  On March 19, 2014, Plaintiff's blood pressure was much improved, but she reported having three to four headaches per week, and dizziness when getting up, bending over or turning her head.  Plaintiff stated that her headaches were gradually worsening.  She had a blood pressure of 131/89 and a normal mood and affect.  Plaintiff's medications included Toprol-XL for blood pressure, allergy medications, and Pamelor for depression.  Plaintiff had a follow up on July 31, 2014 concerning congestion and neck pain.  Plaintiff described a stabbing pain in her neck that is worse at night.  She had a blood pressure of 136/83 and reported back pain, neck pain, and diarrhea with blood.

On September 15, 2014, Nurse Reed completed a Medical Source Document – Physical Capacity reciting the diagnoses of congenital hydrocephalus, scoliosis, neck pain, carpal tunnel, bilaterally, left knee pain, migraine, depression with anxiety and allergic rhinitis.  She opined that Plaintiff has a poor prognosis for the ability to return to work and only has the ability to work light

duty for two hours per day. Nurse Reed additionally concluded that Plaintiff would likely miss work more than three times per month and her pain would frequently interfere with her attention and concentration. Nurse Reed assessed a severe limitation in Plaintiff's ability to deal with work stress. She determined that Plaintiff could sit, stand and walk for less than two hours per eight-hour workday, walk for one city block, frequently lift and carry up to ten pounds and occasionally lift and carry twenty pounds. Nurse Reed stated that Plaintiff's persistence and pace in performing work activities would be frequently affected by her symptoms. She opined that Plaintiff cannot sit without back support, she has pain with prolonged standing, she is nervous in crowds and stressful environments and computer use exacerbates her neck pain and carpal tunnel syndrome.

*Administrative Hearing*

Plaintiff testified at her hearing before the ALJ on September 16, 2014. Plaintiff testified that she was born on June 16, 1972 and she was forty-two years old on the date of the hearing. Plaintiff stated that she is single and does not have any dependent children. Plaintiff is right handed and has a height of five feet three inches and a weight of two hundred and forty pounds. She completed high school and one year of college.

Plaintiff testified that she has not worked since her alleged onset date. Her last job was for Fed Ex as a customer service representative. She explained that she had to stop working there because she could not work around copiers or computers or lift heavy boxes. Plaintiff stated that her conditions that keep her from being able to work include hydrocephalus, scoliosis, migraines, anxiety, depression and carpal tunnel syndrome.

Plaintiff testified that she had a shunt replaced on September 8, 2009 to maintain the fluid level on her brain. She stated that she has had a problem with fluid on her brain since childhood and the shunt was replaced due to a malfunction. Plaintiff explained that the copiers at her job at

Fed Ex would cause her shunt to reset because of the electromagnetic field. The shunt is adjustable with a magnet. Plaintiff testified that these occurrences caused her to have excruciating headaches, migraines, blurred vision and slurred speech. Plaintiff stated that noises such as keys grinding, paper shuffling, and fingers or finger nails tapping can also cause her to have migraines. She takes over-the-counter medication when she has a migraine. Plaintiff explained that she did not want to work someplace else when she had problems working at Fed Ex because she had experience at Fed Ex and did not feel comfortable working somewhere else. Plaintiff testified that she eventually quit her job at Fed Ex because she could not handle it emotionally.

Plaintiff testified that she has migraines four or five days per week that last for one or two hours. She stated that it became a problem at her job at Fed Ex because her manager thought she was faking it when she would ask to go home or sit down for a while. Plaintiff experiences aggression that causes her to pull her hair and hit herself and to also throw things around her.

With regard to her mental impairments, Plaintiff testified that she was raped as a child. She experiences anxiety around men other than her father and depression that causes her to cry all the time. Plaintiff stated that she has insomnia and hyperventilates. She estimated that she has an anxiety attack once or twice per week and they last for about an hour. Plaintiff stated that she has been told that she has obsessive compulsive disorder. She yelled at coworkers when things in the store were moved because she felt that everything needed to be perfect. Plaintiff testified that she has not had mental health treatment recently, but she is on a waiting list for treatment at the Andrews Center. She stated that she takes medication that makes her more mellow.

Plaintiff testified that she has back aches from the middle of her back down to her lower back and she has arthritis in her joints. As a result of her scoliosis, she opined that she has limitations lifting, bending, standing, twisting and kneeling. Plaintiff stated that her carpal tunnel

syndrome affects her ability to lift, write and work on the computer. She can grasp with both hands, but she will have pain that makes her hands shake and she cannot grasp for very long or very strong on the left. She is able to pick up small items, such as a paperclip. Plaintiff stated that she wears braces on both arms when she is sleeping and when she is using the computer or her cell phone or driving. She has not had any diagnostic testing related to carpal tunnel syndrome. Plaintiff additionally testified that her medications make her sleepy and she lays down once or twice per day.

Plaintiff's father, Larry Lamb, provided testimony at the hearing. Mr. Lamb testified that Plaintiff lives with him. In his opinion, Plaintiff cannot lift anything over fifteen pounds and cannot stand or sit for long periods of time because of the rods in her back. He explained that the rods were placed in her back when she was a teenager to treat scoliosis. Mr. Lamb described Plaintiff's mood as consistent, but he stated that there are times when she will get upset with herself. He estimated that Plaintiff sleeps until noon and then she naps twice per day for a total of five hours. When she is up, Plaintiff watches television, eats and works on her medical journal.

A vocational expert, Harris Rowzie, also testified at Plaintiff's hearing. Mr. Rowzie testified that Plaintiff's past work included jobs that are classified in the DOT as customer service representative, DOT 249.362-026, cashier, DOT 211.462-010 and short order cook, DOT 313.374-014. The ALJ presented Mr. Rowzie with a hypothetical individual of the same age, education and work experience as Plaintiff with moderate difficulty in concentration, persistence and pace, moderate difficulty with social functioning such that she is limited to simple, routine, repetitive tasks, with a limitation to unskilled work with simple instructions and simple work-related decisions, few workplace changes and little judgment required, no more than occasional contact with coworkers and simple and direct supervision. Additionally, the hypothetical individual is

limited to a physical residual functional capacity that allows for lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking with normal breaks about six hours in an eight-hour workday, sitting with normal breaks up to six hours in an eight-hour workday, no limitations on pushing, pulling or operating hand or foot controls, with frequent climbing of ramps or stairs, occasional balancing, occasional stooping and no climbing of ladders, ropes or scaffolds, and avoiding even moderate exposure to hazardous machinery or unprotected heights. With this hypothetical, Mr. Rowzie testified that the individual could not perform Plaintiff's past work, either as she performed it or as it is generally performed.

Mr. Rowzie then identified the following jobs that the hypothetical individual could perform: (1) housekeeping cleaner, light, SVP 2, DOT 323.878-014, with 866,000 jobs in the national economy and 56,000 jobs in Texas; (2) bench assembler, light, SVP 2, DOT 706.684-042, with 229,000 jobs in the national economy and 8,800 jobs in Texas; and (3) cleaner, polisher, light, SVP 2, DOT 709.687-010, with 94,000 jobs in the national economy and 31,000 jobs in Texas. If the individual is reduced to occasional use of the hands due to wearing braces, Mr. Rowzie stated that these jobs would be eliminated.

If the hypothetical individual is reduced to the sedentary exertional level such that she can only occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, stand and walk for at least two hours of an eight-hour workday and sit for about six hours in an eight-hour workday with normal breaks and all of the other limitations from the previous hypothetical, Mr. Rowzie identified the following jobs that the individual could perform: (1) document preparer, sedentary, SVP 2, DOT 249.587-018, with 800,000 jobs in the national economy and 258,000 jobs in Texas; and (2) clerk, sedentary, SVP 2, DOT 734.687-018 with 229,000 jobs in the national economy and 8,800 jobs in Texas. Mr. Rowzie testified that his consideration of these jobs is

consistent with the DOT. If the hypothetical is reduced to an individual limited to occasional use of the hands, Mr. Rowzie opined that these jobs would be eliminated because unskilled sedentary work requires frequent use of the hands.

Presented with a hypothetical individual with Plaintiff's background that can occasionally lift and carry twenty pounds, stand and walk for less than two hours of an eight-hour workday, and sit for less than two hours of an eight-hour workday, Mr. Rowzie testified that the individual would be precluded from all full-time competitive employment. Similarly, an individual missing work more than three times per month on a regular and ongoing basis or taking excessive unscheduled breaks would be unable to maintain full-time competitive employment. Mr. Rowzie testified that none of the identified jobs require an individual to be around electromagnetic fields and none of the jobs would be effected by a limitation to avoid moderate exposure to vibration or extreme cold.

## DISCUSSION AND ANALYSIS

In her brief, Plaintiff identifies two issues for review: (1) whether the ALJ's Step Five finding is supported by proper vocational expert testimony; and (2) whether the ALJ erred in finding that she retained the residual functional capacity ("RFC") for a modified range of sedentary work.

Plaintiff asserts that the hypothetical presented to the vocational expert failed to include a limitation of no more than occasional contact with the general public, which is included in the ALJ's RFC finding. Additionally, the hypothetical stated a limitation to simple and direct supervision, while the ALJ's RFC finding states that Plaintiff should have no more than occasional contact with supervisors. Plaintiff states that these discrepancies result in a finding at Step Five that is not supported by substantial evidence.

Plaintiff complains that the ALJ's hypothetical to the vocational expert witness did not include a restriction for only occasional contact with the general public or supervisors. The ALJ's RFC finding limits Plaintiff to "simple, routine, repetitive tasks with no more than occasional contact with the general public, co-workers and supervisors."[1] The hypothetical presented to the vocational expert witness at the hearing included moderate difficulty in social functioning such that she is limited to simple, routine, repetitive tasks, with a limitation to unskilled work with simple instructions and simple work-related decisions, few workplace changes and little judgment required, no more than occasional contact with coworkers and simple and direct supervision.[2] The jobs identified by the vocational expert witness for less than a full range of sedentary work include a document preparer and a clerk.

Plaintiff's brief does not show that the identified unskilled sedentary jobs described by the vocational expert are inconsistent with an RFC limitation of occasional contact with supervisors or the general public. The ALJ's hypothetical to the vocational expert noted that the individual would have moderate difficulty with social functioning. The Commissioner points out that unskilled jobs "ordinarily involve dealing primarily with objects, rather than data or people." *See* SSR 85-15, at *4. Here, the hypothetical presented to the vocational expert "can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ." *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Additionally, Plaintiff's counsel at the hearing had an opportunity to question the vocational expert and could have corrected the alleged defect if he felt that the hypothetical did not reasonably incorporate all of Plaintiff's social functioning limitations that were supported by the medical record. *Id.*

---

[1] *See* Administrative Record, ECF 12-2, at *19.
[2] *See* Administrative Record, ECF 12-2, at *69.

Plaintiff also argues that the vocational expert's statements concerning the number of jobs available are suspect when viewed in the context of the total jobs reported on the Occupational Employment Survey. Mr. Rowzie provided an expert opinion at the hearing concerning the number of jobs available in the regional and national economy for the identified positions. Plaintiff did not question the numbers provided by the vocational expert witness on cross-examination at the hearing and did not ask the vocational expert witness to explain any discrepancies between his testimony and the Occupational Employment Survey. Plaintiff has not shown good cause for the failure to incorporate this evidence into the record during the administrative proceeding. *Latham*, 36 F.3d at 483.

The ALJ's finding that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform was based upon the vocational expert's unchallenged testimony concerning the number of jobs available. The ALJ properly relied on the vocational expert's testimony demonstrating the existence of a significant number of jobs in the national and Texas economy and his opinion is supported by substantial evidence. *See Dominguez v. Astrue*, 286 Fed.Appx. 182, 188 (5th Cir.2008); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Finally, Plaintiff asserts that the ALJ failed to properly consider the opinions of Dr. Renfroe and Nurse Reed concerning her limitations. She submits that the ALJ improperly discounted Dr. Renfroe's opinion by failing to recognize his examination findings that would support a disability finding. Additionally, Plaintiff argues that the ALJ improperly rejected Nurse Reed's source statement as lacking reference to objective findings. Plaintiff submits that she has been treated many times for migraine headaches that interfere with her ability to work.

In his RFC evaluation, the ALJ summarized the findings of both consultative psychological examiners, Dr. Westmoreland and Dr. Renfroe. He noted that Dr. Westmoreland assessed a GAF

score of 55, reflecting moderate impairments, while Dr. Renfroe assessed a GAF score of 45, reflecting serious impairment. The ALJ assessed little weight to Dr. Renfroe's GAF score because it was a one-time evaluation and the level of functional limitations represented by a GAF score of 45 is inconsistent with Dr. Renfroe's mental status exam findings.

Notably, Dr. Renfroe's examination notes state that Plaintiff was appropriately dressed and groomed, cooperative, freely engaged in conversation, her behavior was within normal limits, she exhibited intact speech and thought processes, she has never taken psychiatric medication, she exhibited average intelligence, and her memory and judgment were intact. Plaintiff reported flashbacks and exhibited avoidance behavior when reminded of abusive situations. Plaintiff self-reported suicidal ideation, depressed mood, anxiety and difficulty completing tasks. Dr. Renfroe observed a flat affect. The examination notes from Dr. Westmoreland and Dr. Renfroe are very similar with the exception of Dr. Westmoreland's observation of mild restlessness and a mildly elated and anxious affect.

Presented with opinions from two consultative examiners, the ALJ gave significant weight to Dr. Westmoreland's opinion and little weight to Dr. Renfroe's conclusion concerning Plaintiff's functional limitations. Before rejecting an examining physician's opinion, an ALJ must consider the opinion in the context of 20 C.F.R. §404.1527(d)(2), which outlines the following criteria for consideration: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). This analysis is unnecessary, however, if there is contrary and reliable medical evidence. *Id.* at 453.

Here, the ALJ provided an explanation for the weight given to Dr. Renfroe's opinion. The ALJ considered the opinion and assessed the amount of weight to assign the opinion as required by 20 C.F.R. § 404.1527. The ALJ's expressed reasons for assigning little weight to the opinion show consideration of the § 404.1527 factors. In addition, the summarized medical record in the ALJ's opinion contains all of the other information required for assessment of the § 404.1527 factors and that information was before the ALJ. *See Rollins v. Astrue*, 464 Fed.Appx. 353, 358 (5th Cir. 2012). It is not proper for the Court to reweigh the evidence in the record or to resolve conflicts in the evidence. *Bowling*, 36 F.3d at 435; *Spellman*, 1 F.3d at 360. The ALJ provided specific, appropriate reasons for the weight assigned to Dr. Renfroe's opinion and his finding is supported by substantial evidence.

Nurse Reed is a nurse practitioner. Pursuant to SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006), a nurse practitioner is not an acceptable medical source. Instead, a nurse practioner is treated as an "other source." *Id*. "Other" treating sources cannot establish the existence of a medically determinable impairment but may provide insight into the severity of the impairment and its effect on the individual's ability to function. *Id*. The opinion of an "other source" is not entitled to the same deference as an acceptable medical source opinion. *See Thibodeaux v. Astrue*, 324 Fed.Appx. 440 (5th Cir. 2009).

The ALJ evaluated Nurse Reed's opinion and determined that it was entitled to little weight. The ALJ explained that Nurse Reed's opinion lacks reference to objective findings or narrative treatment notes to support such severe restrictions. The form completed by Nurse Reed is a one-page form with check boxes. On the form, she lists nine diagnoses without reference to how those diagnoses were reached. She also includes a conclusory statement that Plaintiff "cannot sit without back support, pain increases w[ith] prolonged standing" without an explanation

regarding what diagnoses or examination lead her to that conclusion.[3] The treatment notes in the record show that Nurse Reed saw Plaintiff four times over an eight-month time period prior to completing the form. Plaintiff's visits to the family clinic included treatment for headache, well woman care and treatment for hypertension. The notes related to headache reference Plaintiff's subjective statements and there are no diagnostic or examination findings identifying the source of the headaches or the limitations that they cause Plaintiff to experience. The ALJ properly considered Nurse Reed's opinion and explained the reason for the amount of weight to given to the opinion. *See* 20 C.F.R. § 404.1527(f)(2). The ALJ's RFC finding is supported by substantial evidence.

In this case, the ALJ applied the correct legal standards and the decision is supported by substantial evidence. The Commissioner's decision should be affirmed and the complaint should be dismissed. It is therefore

**ORDERED** that the Commissioner's final decision is **AFFIRMED** and this social security action is **DISMISSED WITH PREJUDICE**.

So ORDERED and SIGNED this 13th day of March, 2018.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

---

[3] *See* Administrative Record, ECF 12-9, at *146.